

## ORDERED in the Southern District of Florida on August 07, 2007.

_____

**A. Jay Cristol, Judge**
**United States Bankruptcy Court**

_____

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

In re:

BANKEST CAPITAL CORPORATION,                    CASE NO. 04-10941-BKC-AJC

     Debtor.                                         CHAPTER 7
_____/

SONEET KAPILA, as the Chapter 7
Trustee for the estate of
BANKEST CAPITAL CORPORATION,

     Plaintiff,                                  ADV.  NO. 05-1113-BKC-AJC-A

vs.

ESPIRITO SANTO BANK,
a Florida chartered bank,

     Defendant.
_____/

### <u>MEMORANDUM ORDER GRANTING PLAINTIFF SUMMARY JUDGMENT ON COUNT II OF THE COMPLAINT</u>

This matter came before the Court for hearing on July 2, 2007 at 2:00 p.m. on Plaintiff

Soneet Kapila's Motion for Summary Judgment (DE #161) on his claims to avoid a $10,000,000

transfer to Defendant, Espirito Santo Bank (the "Bank").  For the reasons set forth herein, the motion

is GRANTED.

## INTRODUCTION AND SUMMARY OF PRIOR RULING

### The Trustee's Claims

Plaintiff, Soneet Kapila (the "Trustee"), is Chapter 7 trustee of the estate of the debtor,

Bankest Capital Corp. ("BCC" or "Debtor").  BCC  was a factoring company owned and controlled

by Eduardo and Hector Orlansky (collectively "the Orlanskys").  Prior to September 2002, BCC and

the Bank each owned a 50% interest in another factoring company, E.S. Bankest, L.C. ("E.S.

Bankest"). (App. 1 at 5; App. 2, 3).[1]

On September 18, 2002, the sum of $10,000,000 (the "Payment") was transferred  to the

Bank from a law firm trust account held in the name of BCC.  In exchange for the Payment, BCC

received an assignment from the Bank of the Bank's 50% membership interest in E.S. Bankest.

(App. 5 at 7). Less than one year later, both E.S. Bankest and BCC were in federal receivership and

were exposed as a massive fraud. (App. 1; App. 4 at 8, 15-16). Both of the Orlanskys have been

convicted of conspiracy to commit bank fraud and multiple related federal criminal offenses and

await sentencing. [2]  Both BCC and E.S. Bankest are now debtors in separate bankruptcy cases before

---

[1]    All "App." citations are to the Appendix of exhibits filed with the Trustee's Summary
Judgment Motion. (DE #161).

[2]    Case No. 03-20951-Cr-Jordan in the U.S. District Court for the Southern District of
Florida.

2

this Court.[3]

The Trustee is suing the Bank, pursuant to his powers under 11 U.S.C. §544(b), to avoid and recover the $10,000,000 Payment as a fraudulent transfer. In Count I of his complaint (the "Complaint" — DE #1), the Trustee has asserted a fraudulent transfer claim (the "Intentionally Fraudulent Transfer Claim") against the Bank pursuant to §726.105(1)(a), Fla. Stat. In Count II, he has asserted a fraudulent transfer claim (the "Constructively Fraudulent Transfer Claim") against the Bank pursuant to §726.105(1)(b), Fla. Stat. In Count III, he seeks recovery of all avoided transfers from the Bank pursuant to 11 U.S.C. §550. (DE #1). The Bank has filed an amended answer, raising a single affirmative defense. (DE #8).

## The First Summary Judgment Order

On September 28, 2005, Plaintiff filed his Motion for Summary Judgment (the "First SJ Motion") only as to Count II of the Complaint. (DE #25). This Court (Schermer, J.) heard oral argument on the First SJ Motion on December 16, 2005. (C.P. #50). On May 18, 2006, Judge Schermer, sitting by designation in the Southern District of Florida, entered an order (the "First SJ Order")(DE # 51), [4] in which he made conclusive findings, pursuant to Fed.R.Civ.P. 56(d), that BCC

---

[3]    *In re: Bankest Capital Corp.*, Case No. 04-10941-BKC-AJC and *In re: E.S. Bankest, L.C.*, Case No. 04-17602-BKC-AJC.

[4]    As noted in the First SJ Order at 5, n.1, the parties and the Court have informally referred to the relief granted in the order as "partial summary judgment." Strictly speaking, the First SJ Order was not a "judgment" but an order conclusively establishing certain facts for all purposes in this adversary proceeding, as expressly authorized by Fed.R.Bankr.P. 7056, which incorporates Fed.R.Civ.P. 56(d).

(i) did not receive reasonably equivalent value in exchange for the Payment, and (ii) at the time of the transfer, BCC (a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.[5]

Only by a "thin margin" did the Court withhold summary judgment at that time in respect of the final element of the Trustee's Count II Constructively Fraudulent Transfer claim, *i.e.*, whether the Payment was a transfer by BCC of an interest in its property. (First SJ Order at 3). The Court therefore stated that:

> The only remaining issue for trial as to Count II of the Complaint [the constructive fraud claim] will be whether the $10,000,000 Payment to the Bank was a "transfer" by BCC of an interest in property within the meaning of 11 U.S.C. §544(b) and §726.105(1)(b), Fla. Stat.

*Id.* at 19. This Court now finds that summary judgment is also appropriate as to this final element of the Trustee's Count II Constructively Fraudulent Transfer claim (which is also an element of his Count I Intentionally Fraudulent Transfer claim).

### The Renewed Summary Judgment Motion

On May 14, 2007, the Trustee filed his second Motion for Summary Judgment (DE #161)(the "Renewed SJ Motion"). In the Renewed SJ Motion, the Trustee seeks summary judgment on all

---

[5]    These findings are conclusive and binding on the parties for all purposes at trial, including both the constructive fraud and actual fraud claims, and are incorporated herein by reference. First SJ Order at 19.

remaining issues and counts in his Complaint, specifically (i) Count I, where the issues are whether the Payment was a "transfer" of the Debtor's property made with actual intent to hinder, delay or defraud creditors; (ii) Count II, where the only remaining issue is whether the Payment was a "transfer" of the Debtor's property; and (iii) Count III, in which the Trustee seeks to recover the amount of the avoided transfer, together with prejudgment interest, from the Bank pursuant to 11 U.S.C. §550.

Defendant filed a memorandum and supporting papers in opposition to the Renewed SJ Motion. (DE ## 173, 174, 175, 176, 177, and 178). The Court conducted a hearing on the motion on July 2, 2007.[6]

The Court has reviewed the Renewed SJ Motion, all of Defendant's opposition papers and affidavits, and the affidavits and exhibits supporting the Renewed SJ Motion. The Court also heard extensive argument of counsel at the July 2, 2007 hearing. For the reasons stated herein, the Court grants in part the Renewed SJ Motion, and will enter a separate final judgment in favor of Plaintiff on Counts II and III of the Complaint.

The record, as further developed since the entry of the First SJ Order, reflects that there are no genuine issues of material fact and that Plaintiff is entitled to a judgment as a matter of law finding that the Payment to the Bank was a transfer by BCC of an interest in its property within the meaning of 11 U.S.C. §544(b) and §726.105(1), Fla. Stat.. The Court does not, however, believe summary judgment is appropriate with respect to the issue of whether BCC made the payment with actual intent to hinder, delay or defraud creditors.

---

[6]      The transcript of the hearing appears at DE # 179.

## SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56, as incorporated by Fed.R.Bankr.P. 7056, summary judgment <u>shall</u> be granted if the record of the case shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The Supreme Court has affirmed the vitality of summary judgment as a method for the just, speedy and inexpensive disposition of cases.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party identifies those portions of the record that demonstrate the absence of a genuine issue of material fact, any party opposing summary judgment must set forth specific facts showing a genuine issue for trial, and may not rely on mere allegations or denials.  <u>Celotex</u>, 477 U.S. at 324; <u>Anderson</u>, 477 U.S. at 256-57; <u>Martin v. Commercial Union Ins. Co.</u>, 935 F.2d 235, 238 (11th Cir. 1991).  If the record as a whole could not lead a rational finder of fact to find for the non-moving party, then there is no genuine issue of fact precluding summary judgment.  <u>Matsushita</u>, 475 U.S. at 586-87.

Where the factual context renders the non-moving party's position implausible,  it must come up with  more persuasive evidence than would otherwise be necessary to defeat summary judgment. <u>Id.</u> at 587.  "To defeat a motion for summary judgment the non-movant must demonstrate that there is more than a scintilla of evidence in support of his position ... and that there exists a genuine issue of material fact for trial." <u>In re E.S. Bankest, L.C.</u>, 2006 WL 3922112 at *2 (Bankr. S.D.Fla. 2006).

Applying these principles to Plaintiff's claims in this adversary proceeding, the Court finds that, when the record as a whole is considered, there is no genuine issue of material fact as to the

remaining issues in Count II of the Complaint, and that the Trustee is entitled to entry of judgment

on Counts II and III of his Complaint as a matter of law.

## GOVERNING STATUTES

Section §544(b) of the Bankruptcy Code provides, in relevant part:

[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

Under §544(b), Plaintiff, as trustee for BCC, may exercise the rights of creditors under state

fraudulent transfer statutes to avoid transfers of an interest of the debtor in property.  Butler v.

NationsBank, N.A., 58 F.3d 1022 (4th Cir. 1995); In re A.M. Operating Corp., 32 B.R. 38 (Bankr.

S.D.Fla. 1983); In re Brasby, 109 B.R. 113 (Bankr. E.D.Pa. 1990).

Florida Statute §726.105(1) is one such statute under which a trustee may avoid certain

transfers. It provides, in relevant part:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1.    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2.    Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

As previously stated, the only remaining issues unresolved after the First SJ Order are (i)

7

whether the Payment was a "transfer" of " an interest in ... property of the debtor" within the meaning of the statute (this issue is common to both Counts I and II, and is the only remaining element of Count II not resolved by the First SJ Order) and (ii) whether the Debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor" (this is the other element that Plaintiff must establish under Count I).

## DISCUSSION AND ANALYSIS

### I.    THE PAYMENT WAS A TRANSFER OF INTEREST IN PROPERTY OF THE DEBTOR

The common issue for determination on both the Count I Intentionally Fraudulent Transfer Claim and the Count II Constructively Fraudulent Transfer Claim is whether the $10,000,000 payment in question was property in which BCC had an interest.  If so, it was an "asset" of the Debtor that was the subject of a "transfer." Fla. Stats. §§726.102(2) and 726.102(12).

#### A.    The Legal Test: Control

In this circuit, courts "must look beyond the particular transfers in question to the entire circumstance of the transactions" in determining whether property is "property of the debtor" for fraudulent transfer purposes. Nordberg v. Sanchez (In re Chase & Sanborn Corp.), 813 F.2d 1177, 1181-1182 (11th Cir. 1987).   The dispositive question is whether the Debtor had *control* over the subject funds. *Id.*  Application of the "control" test, as adopted in this circuit, "simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1199 (11th Cir. 1988).

In In re Safe-T-Brake of South Florida, Inc., 162  B.R. 359 (Bankr. S.D.Fla. 1993), this

Court (Ginsberg, J.) articulated the elements of "control" for purposes of this analysis:

> [C]ontrol has two components: first, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid.

*Id.* at 365 (quoting <u>Matter of Smith</u>, 966 F.2d 1527, 1539 (7th Cir. 1992)(dissenting opinion of Flaum, J.)).

Some courts have complemented the control analysis by asking whose interests are primarily served by the challenged transaction. Where the transaction primarily serves the interests of the debtor, courts generally find a transfer of "property of the debtor." *Cf.* <u>Matter of Howdeshell of Ft. Myers</u>, 55 B.R. 470 (Bankr. M.D.Fla. 1985); <u>In re Bowers-Siemon Chemicals Co.</u>, 139 B.R. 436 (Bankr. N.D. Ill. 1992). Conversely, where the debtor's interests do not provide the impetus for the transaction, as was the case in <u>Sanchez/Chase & Sanborn</u>, 813 F.2d at 1177, courts are more likely to find that there was no fraudulent transfer of property of the debtor.

**B.    <u>BCC's Control Over the Funds</u>**

The parties agree to the following facts:

> The $10,000,000 sum was transferred to the Bank from a trust account at BCC's law firm, Gunster Yoakley.

> The funds were deposited into the Gunster Yoakley trust account by, or on behalf of, Bankest International, Inc. ("BI") and Winston Financial Corp. ("Winston").

> Each of BCC, BI, and Winston was completely controlled by Hector Orlansky and Eduardo Orlansky.[7]

---

[7]    Bank's Summary Judgment Motion (DE #103) at 1-2. Hector and Eduardo Orlansky were the beneficial owners of the equity of BI at the time of Payment. (Deposition of Mark Scheer (DE

The additional undisputed record evidence discussed below clearly establishes that BCC had an interest in the funds that were transferred to the Bank. The record also reflects that the Bank has failed to demonstrate the existence of a genuine issue of material fact with respect to its argument that the funds were "earmarked" by BI and Winston for payment to the Bank and thus were not BCC's "property."

> 1. **BESIL's Proofs of Claim Filed On Behalf of BI and Winston Indicate the Transfers To the Gunster Yoakley Trust Account Were Loans to BCC**

Evidence that the funds were BCC's property is found in the sworn proofs of claim that the Bank's own affiliate, BESIL — as assignee of the rights of BI and Winston — has filed on behalf of those entities. *(*App. 6, 7, and 8). These claims, which collectively include the subject funds that were transferred into the Gunster Yoakley trust account, are for "money loaned."

Each of the bills of sale[8] by which BI and Winston respectively transferred their claims against BCC to BESIL contains a representation that "the Assignor has provided to BESIL all necessary supporting documentation in respect of the Claim to the best of his knowledge." No documents evidencing any "earmarking" conditions are attached to the claims, and no such documentation has been produced by BESIL or the Bank.[9]

---

#148)(the "Gunster Depo") at 175-176). BI owned 100% of BCC. *Id.* at 188.

[8]    Exhibits 174 and 175, respectively to the deposition of Victor Balestra, the Bank's Chairman and former CEO, and designated corporate representative of BESIL ("Balestra Depo") (DE #154). (Exhibits to that deposition are filed at DE # 155). Copies are attached at App. 9 and 10 to the Renewed SJ Motion.

[9]    BI's bill of sale to BESIL of all of its rights against BCC (App. 9) reiterates BESIL's position that BI made a fraudulent transfer (and therefore, by definition, a completed transfer) to BCC, as said bill of sale expressly includes a conveyance of "claims of [BI] for the fraudulent transfer of money or property ... against [BCC]." See Fisher v. Grady, 178 So. 852, 857 (Fla. 1938)("It is an established rule of law that all deeds, conveyances and bills of sale entered into for the purpose of defrauding creditors are valid between the parties, and such fraudulent conveyances vest title absolutely

Although the Bank has traced the provenance of the funds <u>prior</u> to their deposit into the Gunster Yoakley Trust Account, BESIL (in its own right and as assignee of BI and Winston) has acknowledged the crucial fact that, on their last stop prior to being transferred to the Bank, the funds had arrived in the trust account pursuant to completed transfers by Winston and BI <u>to BCC</u>.

> **2.    The Parties Acknowledged That The Transferred Funds Belonged To The Debtor**

The contemporaneous communications by the parties to the subject transaction also overwhelmingly reflect their understanding that the funds were "property of" BCC, reinforcing the Court's conclusion as to the absence of a genuine issue of material fact on this issue.

> **a.    All Documents Related to the Transaction Reflect That BCC Owned and Controlled The Funds**

On September 18, 2002 – the day of the $10,000,000 Payment at issue – Mark Scheer of Gunster Yoakley wrote a letter to the Orlansky brothers (addressed to them <u>at Bankest Capital Corp.</u>), which stated, in its entirety:

> This letter is intended to confirm your authorization to disburse <u>the funds we hold on behalf of Bankest Capital Corp.</u> (and sent by BI Corp.) to Espirito Santo Bank in connection with the purchase of Espirito Santo Bank's 50% membership interest in E.S. Bankest L.C.  Kindly acknowledge your authorization by signing this letter as indicated below.

(App. 11)(Document GY-8-3-06-0009, included within Composite Exhibit 73 to Gunster Depo[10])(emphasis added).  Eduardo and Hector Orlanskys' signatures on this letter <u>expressly</u>

---

in the grantees, and secure to them a perfect estate, except as to those persons actually defrauded by the transaction."); <u>In re Old Naples Securities, Inc.</u>, 343 B.R. 310 (Bankr. M.D.Fla. 2006)(property obtained by a debtor via a fraudulent Ponzi scheme is still property of the debtor for purposes of the fraudulent transfer provisions).

[10]    The deposition ("Gunster Depo") of Mark Scheer, who testified in his individual capacity and as corporate representative of the Gunster Yoakley law firm, has been filed with the Court. (DE # 148). Mr. Scheer's deposition had not been taken at the time Judge Schermer denied the First

acknowledge that, as of the date of the transfer, Gunster held the funds on behalf of BCC.  Scheer

addressed the letter to the Orlanskys at BCC  "[b]ecause at the time we were holding the funds,

to my knowledge, on behalf of Bankest Capital Corp. ... It was my understanding that those funds

were held solely on account of Bankest Capital." (Gunster Depo at 189-191).

Gunster Yoakley's internal accounting records confirm that the funds were held for BCC.

The internal trust account from which the $10 million check to the Bank was issued was

maintained as a trust account for BCC. (Document GY-8-3-06-0001, included within Composite

Exhibit 73 to Gunster Depo )(App. 12). The money market account that Gunster established at

Mellon United National Bank for the purpose of issuing the check was opened for BCC.

(Document GY-8-3-06-0002, included within Composite Exhibit 73 to Gunster Depo )(App. 13).

BCC's taxpayer identification number was used  for the account. (Gunster Depo at 184).

Moreover, BCC's contemporaneous internal memos and correspondence with its counsel,

Mark Scheer of Gunster Yoakley, reflect BCC's dominion and control over the funds.  These

documents demonstrate that BCC was actively considering alternate uses of the funds in various

ways that would serve its purposes, and they are completely inconsistent with the Bank's position

that the funds were earmarked or restricted by either BI or Winston.  *See, e.g.*, the following

documents:

  --  9/13/02 letter from Scheer to Orlanskys (Exh. 67 to Gunster
Depo)((App. 14)(proposing alternate use by BCC of the $10 million to capitalize a
new factoring company);

  --  9/18/02 letter from Scheer to BCC (App. 11)(Document GY-8-3-
06-0009, included within Composite Exhibit 73 to Gunster Depo );

  --  Scheer memo re "my thoughts on alternatives," including using the

_____

SJ Motion by a "thin margin."

$10 million to fund a Chapter 11 reorganization (App. 15)(Exhs. 68 and 69 to Gunster Depo);

    --    Parlapiano[11] 9/3/02 e-mail to Scheer and Scheer's 9/4/02 response (App. 16)(Exh. 55 to Scheer Depo)(these e-mails, on which the Orlanskys were copied, recite that the funds that were being raised for the 9/18/02 closing with the Bank were "BCC's money" and discussed alternate possible uses of the money).

*See also* Scheer's testimony that alternative uses by BCC of the $10,000,000 was both considered and discussed in the days immediately preceding the Payment. (Scheer Depo at 129-130; 152-156).

### b.    The Actual Use of the Funds Was Exclusively for BCC's Benefit

The actual **use** of the funds further demonstrates BCC's dominion and control over them: The $10 million was used to enable BCC to buy out the Bank's interest in E.S. Bankest (and to thereby prevent discovery of the fraud). Moreover, the Orlanskys authorized Scheer to apply the interest on the trust account funds in reduction of BCC's outstanding legal bills from Gunster. (Gunster Depo at 179-180).

### c.    BCC Booked A Loan Payable Liability in Respect of the Funds

As reflected in the Trustee's sworn declaration ("Kapila Declaration")(App. 17 ), BCC booked the $8 million that it received from BI as a liability to BI, resulting in an $8 million reduction in BCC's existing loan receivable from BI. Kapila Declaration at 9-10. Similarly, the remaining $2 million of the transfer was booked as a liability to Coutts, the financial intermediary for Winston. *Id.* at 10-11. This is consistent with the Proofs of Claim filed by the Bank's affiliate, BESIL, as assignee of BI and Winston's claims against BCC (App. 6, 7, and 8),

---

[11]    Dominick Parlapiano was an officer of both BCC and E.S. Bankest. (Scheer Depo at 18 ).

which affirmatively assert that BI and Winston lent the funds to BCC.  It appears the $2 million from Winston was merely a portion of its $14 million loan to BCC. *See* Winston's proof of claim (App. 6).

Thus, as the borrower and recipient of these funds, BCC  had dominion and control over their disposition.

### 3.      There is No Evidence of an Earmarking Agreement

Following the directive in Sanchez/Chase & Sanborn, 813 F.2d at 1181-1182, to "look ... to the entire circumstance of the transactions," the Trustee has presented overwhelming record evidence demonstrating the absence of a genuine issue of material fact on the issue of whether the funds were BCC's "property." This shifts the burden to the Bank to set forth specific facts showing a genuine issue for trial. Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256-57; Martin, 935 F.2d 235, 238 (11th Cir. 1991).  If the record as a whole could not lead a rational finder of fact to find for the non-moving party, then there is no genuine issue of fact precluding summary judgment.  Matsushita, 475 U.S. at 586-87.

Applying these principles to this record demonstrating BCC's dominion and control over the funds, the Court believes there is insufficient factual evidence to create a genuine issue of material fact that the funds were "earmarked" by BI and Winston for payment to the Bank and thus, were not subject to sufficient dominion and control by BCC to render them "property of" BCC.

The Bank argues that Gunster Yoakley was functioning as an escrow agent, with an obligation to return the funds to BI and Winston if the transaction with the Bank did not close. However, no written escrow agreement has been presented to the Court.  Parties who allegedly

transfer funds in escrow are entitled to no priority or preference over other claimants when they fail to use reasonable diligence to protect themselves. Shultz v. Sun Bank/Naples, 553 So.2d 202, 205 (Fla. 2d DCA 1989).

The record in this case contains no written or oral escrow agreement, and no other facts presented suggest that BCC or Gunster Yoakley was obligated to return the funds to BI and Winston if the purchase from the Bank was not consummated.[12]  Scheer testified that, aside from placing $7,000,000 in Gunster's money market trust account, he was given no other instructions in respect of the funds.  (Gunster Depo at 183, 186).  The Bank has therefore failed to present or proffer any facts supporting the position there was any express earmarking or restriction upon use of the funds.  Cf. Matter of Howdeshell of Ft. Myers, 55 B.R. 470 (Bankr. M.D.Fla.1985) ("property of the debtor" element of  fraudulent transfer claim satisfied  where there was no evidence that the alleged "earmarking" party imposed a condition upon use of the funds to pay a particular creditor).

### 4.    The Cases Cited by the Bank Are Distinguishable

#### a.    *Chase*

In its opposition to the Revised SJ Motion, the Bank relies heavily on Sanchez/Chase & Sanborn, 813 F.2d at 1177, and urges that BCC, like the debtor in Sanchez/Chase, should be viewed as a "mere conduit" who lacked sufficient control over the subject funds for them to be

---

[12]    Morris Berger, the Bank's expert witness, nevertheless opined that, if BCC had filed bankruptcy prior to completion of the September 18, 2002 transfer to the Bank, its trustee would have been obligated to return the funds in the Gunster Yoakley account to BI and Winston.  Morris Berger Deposition (DE # 151) at 179-181. This opinion, unsupported by any escrow agreement or other record evidence of any kind, is insufficient to create a factual issue sufficient to defeat summary judgment. *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1254 (11th Cir. 2007)(expert's conclusory and speculative statements, which were not supported by the record, were insufficient to raise genuine issue of material fact that would preclude summary judgment).

considered the debtor's "property." The Court finds <u>Sanchez/Chase</u> is distinguishable. First, the Court does not accept the proposition that BCC can be viewed as a "mere conduit" in this case, where, *inter alia*, (i) it was the intended, direct, and exclusive beneficiary of the consideration for the Payment (the Bank's 50% interest in E.S. Bankest); (ii) it incurred a $10 million liability to BI and Winston on its balance sheet as a result of the transaction; and (iii) the contemporaneous records of BCC and Gunster Yoakley, and Scheer's uncontradicted testimony, establish that Gunster held the funds for BCC.

Second, <u>Sanchez/Chase</u> itself stands for the proposition that each case must be evaluated on its particular facts. Indeed, in a subsequent, related appeal, the Eleventh Circuit Court of Appeals itself noted that a distinguishing feature of <u>Sanchez/Chase</u> was the fact that, in that case, "The debtor corporation, already defunct, had been reopened just for the purpose of laundering the [subject] funds." <u>Societe Generale/Chase & Sanborn</u>, 848 F.2d at 1199. In the instant case, BCC was an ongoing, active entity. The trust account that Gunster held for BCC's benefit was not used to "launder" funds, but for BCC's purchase of the Bank's interest in E.S. Bankest.

### b.    *Scanlon*

In <u>Dzikowski v. NSAD (In re Scanlon)</u>, 239 F.3d 1195, 1198 (11th Cir. 2001), the other case upon which the Bank relies, funds deposited into a lawyer's trust account for the purpose of paying an obligation of the debtor were held not to be property of the debtor's estate because of the factual findings in that particular case that the grantor of the funds (the debtor's mother-in-law) had given "implicit instructions" that the funds were to be used for this single purpose. <u>Scanlon</u> is distinguishable from the case *sub judice*, however, for the simple reason that no such "implicit instructions" were given by either BI or Winston to Gunster Yoakley, and the record

evidence indicates that possible alternate uses of the funds by BCC were under consideration. Moreover, the court's conclusion in <u>Scanlon</u> that "it is clear that the $650,000 was not intended to benefit the Debtor," *id.*, is distinguishable from the instant case where it is undisputed that the payment of the $10 million was intended to benefit BCC.

The Bank's citation to <u>Scanlon</u> for the proposition that "legal title to funds deposited in escrow remain with the grantor until the occurrence of the condition specified in the escrow agreement" exposes the absence of evidentiary support for its position in this case. Here, there are no indicia of an escrow arrangement with Gunster Yoakley under which BI and Winston were "grantors" who retained control.

Scheer testified that no such escrow agreement was ever requested or created. (Gunster Depo at 182-185, 245). Instead, there are the written instructions[13] to Gunster Yoakley, signed by both of the Orlanskys on a letter addressed to them at <u>BCC</u>, acknowledging that the funds that had been received from BI were held by Gunster Yoakley on behalf of <u>BCC</u>, corroborated by Scheer's testimony that "It was my understanding that those funds were held solely on account of Bankest Capital." (Gunster Depo at 189-191).

Indeed, the only document in the record that uses the term "earmarking" reinforces Plaintiff's position that <u>BCC</u> controlled the funds: Parlapiano's September 3, 2002 e-mail states that the $10 million was "<u>BCC's money earmarked</u> for BCC's purchase of the Bank's equity in [E.S. Bankest]" and, in the next clause of the same sentence discusses <u>alternative</u> uses of the funds by BCC.[14] In short, the Bank has presented no facts that create a genuine issue of material

---

[13]    App. 11.

[14]    App. 16 (emphasis added). Parlapiano suggested in this e-mail that BCC pay the Bank $5 million cash and give it a $5 million promissory note, so that the remaining $5 million in cash could

fact relative to any meeting of the minds between the parties to its alleged earmarking agreement.

This case is far more similar to In re Neponset River Paper Co., 231 B.R. 829 (1st Cir. BAP 1999). There, a third party deposited funds into the debtor's attorney's trust account and the transaction was booked by the parties as a loan from the third party to the debtor.  The funds were then disbursed to one of the debtor's creditors. In the trustee's ensuing preference action, the transferee of the funds argued, as the Bank does here,  that the funds had been "earmarked" and did not constitute property of the debtor.

The court disagreed, noting, *inter alia*, that: (i) "[t]he general rule is that money held by a debtor's attorney is property of the bankruptcy estate," *id.*  at 833; (ii) the ultimate use of the funds did not benefit the party who supplied the funds (a typical attribute of a classic earmarking transaction, in which a guarantor supplies funds to the debtor that are earmarked to satisfy the guaranteed debt); and (iii) there was no evidence of an agreement regarding use of the funds. *Id.* at 833-835.

All of these factors that mitigated against a finding of  "earmarking" in Neponset are present here. The funds were expressly placed in an attorney's trust account for the benefit of BCC.[15]  The intended direct "benefit" from the use of the funds was to inure to BCC, as the acquirer of the Bank's interest in E.S. Bankest, and not to BI or Winston. Finally, there is no evidence that the Orlanskys caused BI or Winston to make any agreement with BCC, or exercise any control, with regard to disposition of the funds.

_____

be applied to other BCC financial requirements.

[15]    As previously noted, BCC debited its loans payable accounts for the $10 million deposited into the Gunster Yoakley trust account. Both Winston and BI (in the person of their assignee, BESIL) have filed sworn proofs of claim in this case claiming these funds as unpaid loans to BCC.

Based upon the overwhelming and uncontradicted record, the Court concludes that BCC had the requisite dominion and control over the funds so as to establish there is no genuine issue of material fact; the Payment constituted a "transfer" to the Bank by BCC of an interest in its property.

II.     **THE COUNT II CONSTRUCTIVELY FRAUDULENT TRANSFER CLAIM: THE TRUSTEE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HIS CLAIM UNDER §726.105(1)(b), FLA. STAT.**

    A.     **The Trustee is Entitled to Judgment, as a Matter of Law, on His Claim Under §726.105(1)(b), Fla. Stat.**

The Trustee's Count II Constructively Fraudulent Transfer Claim arises under

§726.105(1)(b), Fla. Stat., which provides, in relevant part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>         \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
>     (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>         1.     Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
>         2.     Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

The Trustee has now satisfied each of these elements in this case. As previously noted, this Court's SJ Order conclusively established that BCC did not receive reasonably equivalent value for the Payment, and that, at the time of the Payment, BCC (a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in

relation to the business or transaction; or (b) intended to incur, or believed or reasonably should

have believed that it would incur, debts beyond its ability to pay as they became due was

insolvent at the time of the Payment. (DE 51 at 3). Finally, the Payment constituted a "transfer"

by BCC of an interest in its property to the Bank.

**B.      The Bank Has Pleaded No Applicable Defense to Count II**

As to Count II, the Bank's sole affirmative defense (that it "took the transfer in good faith

and for a reasonably equivalent value") fails as a matter of law. §726.109(1), Fla. Stat., expressly

provides that the "good faith for value" defense applies only to claims of voidability under

underlying (a) of §726.105(1).  Thus, it is wholly inapplicable to the Trustee's claim in Count II

of his Complaint, which asserts a claim under subsection (b) of §726.105(1).

Thus, there are no genuine issues of material fact as to Count II. The Trustee is entitled to

judgment as a matter of law on Count II.

**C.      11 U.S.C. §546(e) Does Not Apply**

Finally, in its response to the Revised SJ Motion (DE # 177) filed on June 28, 2007, the

Bank argues that it has a defense to avoidance under 11 U.S.C. §546(e), which insulates certain

"settlement payments" to "financial institutions" from avoidance under §544(b).  However, this

defense does not apply.

Section §546(e) was enacted "to protect the nation's financial securities markets from the

instability caused by the reversal of settled securities transactions" and to "minimize the

displacement caused in the commodities and securities markets in the event of a major

bankruptcy affecting these industries." In re Enron Corp., 323 B.R. 857, 864 (Bankr. S.D.N.Y.

2005). Although the Bank urges that the admittedly unhelpful definition of  "settlement payment"

in 11 U.S.C. §101(51A) must be read broadly, it has nothing to do with the private two-party

assignment transaction at issue in this case:

> Despite the breadth of the meaning of the term settlement payment, courts recognize that it nonetheless has limits. ... In determining those limits, <u>courts consistently focus on the context of the statute as having been designed to protect public markets.</u>
>
> ***
> The boundary that emerges from such decisions approximates the line between public transactions that involve the clearance and settlement process and <u>non-public transactions that do not involve that process.</u>
>
> <u>Thus, common elements in decisions finding that there is not a protected settlement payment are that the securities involved are not publicly traded and public markets are not utilized.</u>

<u>In re Grafton Partners, L.P.</u>, 321 B.R. 527, 539 (9th Cir. BAP 2005)(emphasis added)(internal

citations omitted). The Court in <u>In re Norstan Apparel Shops, Inc.</u>, — B.R. —, 2007 WL 965963

(Bankr. E.D.N.Y. 2007), stated it well:

> If the term "settlement payment" in §546(e) is construed to encompass any payment made for securities, whether or not involving a public securities market, then any leveraged buyout, if structured as a direct purchase of stock from the s hareholders (like the instant transaction) would fall within §546(e)'s safe harbor and thereby be immunized from avoidance under §544 or §548(a)(1)(B) of the Bankruptcy Code. This interpretation flies in the face of the extensive body of jurisprudence under which leveraged buyouts challenged under §544 or §548 have been analyzed for fairness and adequacy of consideration.

*Id.* at *5 (internal citations omitted).  The Court agrees with the analysis in these decisions and

finds that the Payment at issue was not a "settlement payment" within the meaning of 11 U.S.C.

§101(51A). This case did not involve the utilization of public markets or publicly traded

securities.

## III.    THE INTENTIONALLY FRAUDULENT TRANSFER CLAIM : THE TRUSTEE IS NOT ENTITLED TO JUDGMENT ON HIS ALTERNATIVE CLAIM UNDER §726.105(1)(a), FLA. STAT.

The Trustee's alternative avoidance count ---- Count I, the Intentionally Fraudulent Transfer Claim – arises under §726.105(1)(a), Fla. Stat., which provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

Although the Court has herein found that the Trustee is entitled to judgment on Count II as a matter of law as the Payment constituted a transfer of BCC's property, judgment cannot be entered in favor of the Plaintiff on Count I because there remain genuine issues of material fact as to whether BCC made the payment with actual intent to hinder, delay or defraud creditors.

First, summary judgment is particularly difficult to determine in the context of fraudulent transfer actions based upon actual fraudulent intent because the questions are inherently fact based. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Weiss,* 410 F. Supp. 2d 1146, 1159 (M.D. Fla. 2006) (fraud generally not properly the subject of summary judgment because it requires an examination of the relevant facts and circumstances). Second, the record is devoid of evidence establishing direct proof of fraud, Fla. Stat. § 726.105; and, the presence of badges of fraud related to actual, not constructive, fraud is questionable. For example:

- Unlike garden variety actual fraud, the transfer was disclosed and was not concealed. The obligation underlying the transfer arose from a 1998 Shareholder Agreement.

- BCC admitted it had not been sued or threatened with suit in the 2002 time frame.

- Had the Orlanskys not caused the Funds to be transferred to the Bank, the Bank could have and would have purchased BCC's interest in E.S. Bankest for the same

22

price.

-       The record does not reflect that BCC removed, concealed, or absconded with

        assets following the transfer.  BCC continued to operate for a period of time

        following the transfer.

In sum, the hallmarks of a transfer made with actual fraud are not clearly present at this

summary judgment stage of the proceedings.  The fact that BCC and E.S. Bankest were engaged

in fraudulent factoring activities, and that the transfer was designed to ensure that the fraud was

not discovered, does not necessarily mandate a conclusion that the transfer itself occurred with

actual fraud.  For these reasons, summary judgment on Count I must be denied.

### IV.    THE TRUSTEE IS ENTITLED TO RECOVER THE PAYMENT FROM THE BANK PURSUANT TO 11 U.S.C. §550

As demonstrated above, the Payment is avoidable by the Trustee under 11 U.S.C. §544(b)

under Count II for avoidance for constructive fraud. The Trustee is therefore entitled to recover

the Payment from the Bank (the initial transferee of the Payment, and the entity for whose benefit

the Payment was made) under 11 U.S.C. §550(a), which provides, in relevant part:

> [T]o the extent that a transfer is avoided under section 544,
> ... the trustee may recover, for the benefit of the estate, the property
> transferred, or, if the court so orders, the value of such property,
> from -----
>
> (1) the initial transferee of such transfer of the entity for
> whose benefit such transfer was made.

### CONCLUSION

Having thoroughly reviewed the Renewed SJ Motion and the opposing papers, heard

argument of counsel, and being fully advised in the premises, the Court holds that there are no

genuine issues of material fact as to Count II of the Complaint. The Trustee has established his

prima facie case under Counts II and III of his Complaint as a matter of law. He is entitled to avoid the Payment under Count II, and to recover the value of the Payment from the Bank pursuant to Count III.  The Bank's earmarking defense to Count II fails, as a matter of law. Accordingly, it is

**ORDERED AND ADJUDGED** that

1.      Partial summary judgment, on Counts II and III of the Complaint, avoiding the Payment and holding that Plaintiff is entitled to avoid the transfer and to recover $10,000,000.00, is GRANTED.

2.      Count I of the Complaint is rendered moot, and the trial of this proceeding, currently scheduled for August 13, 2007, is cancelled.

3.      Entitlement to interest, costs and attorneys' fees, if any, will be determined upon separate motion, after notice and a hearing.

4.      A separate final judgment, consistent with this order, will be entered.

###

Copies furnished to:

Charles W. Throckmorton
Patricia A. Redmond, Esq.
Harley E. Riedel, Esq.
Paul J. McMahon, Esq.
Edward Shohat, Esq.
Bruce Lehr, Esq.
Paul Avron, Esq.
Steven Thomas, Esq.

[Attorney Throckmorton is directed to serve copies of this order on all interested parties and to file a certificate of service]